IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| PATRICK J. KELLER, et. al., | ) | Case No. CV 03-113-C-EJL-CWD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **REPORT AND** |
| vs. | ) | **RECOMMENDATION RE:** |
| | ) | **PLAINTIFFS' MOTION FOR** |
| LAMAR BURNETT, et. al., | ) | **PARTIAL SUMMARY JUDGMENT** |
| | ) | **TO QUIET TITLE AND** |
| Defendants. | ) | **PLAINTIFFS' MOTIONS TO** |
| | ) | **STRIKE** |
| | ) | |
| | ) | |

## **REPORT**

This matter involves title to the Keller Property, an approximate 2,000 acre ranch in

Idaho County rich with gold deposits.  Aff. of Keller, Exs. A, B, Docket No. 157 (legal

description of ranch property).  Plaintiffs Patrick and Sandra Keller, Rocking A.M. Ranch, LLC,

and Whitetail Ranch Estates, LLC, (collectively "Keller"), the current owners of the Keller

Property, seek to quiet title in three property interests.  The first interest involves mineral rights

to 146 acres of the Keller Property located at the Squaw Bar Placer, which contains valuable

gold deposits.  The second interest is a mining lease executed on June 15, 1981, between L.K.

and Diana Hollenbeak and Defendant Lamar Burnett, known as the "Hollenbeak Lease," that

purportedly gave Burnett the right to mine a portion of the Squaw Bar Placer claim.  Finally, the

parties dispute whether or not an access easement exists over the Keller Property to reach the Squaw Bar Placer.  Defendant Global Development Corporation, International ("Global") contends it owns a 25% undivided interest in mineral rights to the Squaw Bar Placer Claim and a 50% undivided interest in the Hollenbeak Lease, plus the access easement derivative from the lease, which interests it alleges were purchased from the Burnetts' and Jared Brown's Chapter 7 Bankruptcy Trustee at a trustee's sale on August 7, 2006.

The Court issued a tentative ruling concerning all pending motions on July 2, 2008, and expected the parties to be prepared to discuss the issues in the draft memorandum.  On July 9, 2008, the Court held oral argument for all pending motions.  Both parties appeard and had an opportunity to address the Court.  At the hearing, the parties represented that they were engaged in ongoing settlement discussions, and they requested a delay in the ruling until additional settlement discussions could take place.  The Court granted the parties' request.  However, as of July 21, 2008, no notice of settlement was received nor did the parties request an additional period of time before the issuance of the Court's decision, and the matter is now ripe for disposition.

The parties do not dispute the relevant facts concerning the recording history of various deeds throughout the years, but rather the legal effect of the deeds and the facts known to the parties outside of the deeds themselves.  The disputed facts surrounding the deeds preclude summary judgment in this action, at least in part, with respect to the mineral interest claimed by Global.  The Bankruptcy Code renders the disputed facts relating to the easement and the Hollenbeak Lease immaterial.  For the reasons that follow, the Court recommends that Plaintiffs' Motion for Partial Summary Judgment be granted in part and denied in part.

REPORT AND RECOMMENDATION - 2

# I.
# Background

**A.    Facts[1]**

     Hubert and Mary Sewell (collectively, "Sewell") originally owned the Keller Property.
The land encompasses roughly 2,000 acres on the Salmon River and includes a 146 acre area
known as the Squaw Bar.  Aff. of Keller, ¶ 5, Exs. A, B, Docket No. 157.[2]  On May 22, 1968, by
warranty deed, the Sewells conveyed a portion of the Keller Property to L.K. and Diana
Hollenbeak ("Hollenbeak") and Edgar and Geneva Murrison ("Murrison") with an express
reservation of an "undivided one-half (½) interest in all mineral rights to such premises."  Ex. K,
Docket No. 157.[3]  The parties do not dispute that the Hollenbeaks and Murrisons owned a
portion of the Keller Property and 50% of the mineral rights while the Sewells retained the other
50% of the mineral rights in the property.  The mineral rights are referred to as the "Hollenbeak
Mineral Interest" and the "Sewell Mineral Interest."  On March 11, 1980, the Hollenbeaks and
Murrisons executed a warranty deed conveying the Keller Property to SS Ranch, Inc., a
corporation controlled by the Hollenbeaks, and expressly reserved "an undivided one-half (½)
interest in all mineral rights to such property."  Ex. J, Docket No. 157-6.[4]  The Murrisons then

---

[1]  At the hearing, the parties did not dispute the facts as the Court represented them in its tentative ruling.

[2]  The deeds comprising the chain of tile to the Keller Property are attached as exhibits to the Affidavit of
Sandra E. Keller, Docket No. 157, submitted in support of Plaintiffs' Motion for Partial Summary Judgment.  For
ease of reference, the Court will not repeat the reference to the Affidavit, but will refer to the exhibits as "Ex. ___,
Docket 157."

[3]  The Court is unclear which part of the Keller Property was conveyed, as the legal description in Ex. K
resembles, but is not identical to, the legal descriptions of the Keller Property in Exs. A and B.

[4]  It is not clear to the Court from the record whether the Hollenbeaks and Murrisons meant to retain 25%
or the full 50% undivided share of the mineral rights originally received from the Sewells when the conveyance was
made to SS Ranch, Inc.  In either event, the Hollenbeaks retained a portion (either 25% or 12.5%) of the Hollenbeak
Mineral Interest.

executed a quitclaim deed on March 11, 1980, recorded on June 26, 1980, conveying any remaining interest they may have had in the Keller Property to SS Ranch, Inc.  Ex. U, Docket No. 157-9.

On June 15, 1981, the Hollenbeaks entered into a mining lease (the "Hollenbeak Lease") with Lamar Burnett ("Burnett") that proposed to lease the Squaw Bar Placer,[5] an area comprising 136 acres of the Keller Property, to Burnett and permit him to prospect for and remove minerals. Ex. I, Docket No. 157-5.  The terms of the lease required Burnett to perform "at least two thousand dollars ($2,000.00) in work per year on mining claim," deliver to Hollenbeak 10% of all Placer Gold extracted from the property, and maintain the property.  The lease does not contain a term setting forth its duration or a termination date.  According to Burnett, the intent was to include the surface of the mining claim and all of the minerals that it contained.  Aff. of Burnett, ¶ 12, Docket No. 56.  Burnett began mining on the Squaw Bar Placer in 1981, obtained several mining permits, and mined continuously until 2003.  Aff. of Burnett, ¶¶ 23, 30, 31, 32, Docket No. 56.  The Hollenbeak Lease was not recorded until February 6, 2003.

On February 17, 1993, the Sewells executed a warranty deed to the Burnetts recorded on March 4, 1993, conveying an "undivided one-half (½) interest in all mineral rights" to the Keller Property.  Ex. L, Docket No. 157-6.  This conveyance apparently transferred the Sewell Mineral Interest to the Burnetts that the Sewells had previously reserved from the prior land sale to the Hollenbeaks.  Although the parties dispute the validity of the Hollenbeak Lease, the parties do not dispute that, as of February 17, 1993, Burnetts owned the Sewell Mineral Interest and

---

[5] The Squaw Bar Placer is described in the lease agreement as "Lot 7 of Section 11 Lots 2, 3, 6, the east half of SE quarter of NW quarter and the east half of NE quarter of the SW quarter of section 14 in TSP. 25 N. of Range 1 East of Boise Meridian.  136 30/100 acres more or less."  Ex. I, Docket No. 157-5.

REPORT AND RECOMMENDATION - 4

believed they had rights in the Hollenbeak Lease.

On March 19, 1993, the Burnetts executed an "Assignment" purporting to "grant, assign and confirm" to the Duval Family 1988 Reversionary Trust ("Duval Trust") an "undivided fifty percent (50%) interest in and to that certain lease, dated June 15, 1981, in which L.K. Hollenbeak and Diana Hollenbeak are lessors and Lamar Burnett is lessee." Ex. N, Docket No. 157-7; Aff. of Burnett ¶ 16, Docket No. 56. The Burnetts also executed a "Deed of Undivided Interest in Minerals" granting to the Duval Trust "an undivided twenty-five percent (25%) interest in and to all of the gold, silver and other minerals in and under" the Squaw Bar Placer Mining Claim. Ex. O, Docket No. 157-7. Both documents were recorded on December 29, 1994. There is some confusion as to whether the Duval Trust was entitled to record these instruments. *See* Aff. of Sorensen, Burnett Depo., Ex. 1 at 6–8, Docket No. 172-2. Mr. Burnett testified in his deposition that the mineral rights were to be given back to him, but that Mr. Duval's son, Frankie, found the deeds and recorded them instead. Mr. Burnett then purchased the interests after giving Duval the royalty payments for the years that the Duval Trust had owned the interest. *Id*.

Therafter, Mr. Burnett had discussions with Amerigold, LC about mining the Squaw Bar. On October 5, 1994, the Burnetts executed a quitclaim deed that was recorded on October 20, 1994, granting Amerigold LC "[a]ll right, title and interest" to the Squaw Bar Placer, and "[a]ll right, title and interest . . . in and to the mining claims on the Hubert Sewell property" (Keller Property). Ex. M, Docket No. 157-7. At this time, Mr. Burnett had what he described as a partnership with David Brimhall. Aff. of Sorensen, Burnett Depo., Ex. 1 at 6, Docket No. 172-2; Aff. of Burnett, ¶ 19, Docket No. 56 (explaining that "Dave Brimhall owned the same interest by

REPORT AND RECOMMENDATION - 5

virtue of our partnership.").  Accordingly, Mr. Brimhall executed a quitclaim deed on October 7, 1994, granting whatever interests he had in and to the Squaw Bar Placer to Amerigold LC.  Aff. of Burnett, Ex. M2, Docket No. 56-14.

Less than two years later, for reasons unexplained in the record, on January 30, 1996, Amerigold LC reconveyed its interests in the Squaw Bar Placer back to the Burnetts after executing a "Bargain and Sale Deed" on January 30, 1996, which deed was subsequently recorded.  Aff. of Burnett, Ex. N, Docket No. 56.  Six months later, the Burnetts executed a quitclaim deed on June 25, 1996, that went unrecorded until February 18, 2000, granting to Amerigold LC "whatever mineral rights they own" in the Squaw Bar Placer and "[a]ll right, title and interest . . . in and to the mineral rights on the Hubert Sewell Property" (Keller Property). Ex. P, Docket No. 157-7.  In the June 1996 conveyance, the legal description of the property transferred was identical to the description in the two prior conveyances, except that the phrase "mining claims" was crossed out and above it "mineral rights" was inserted.  The June 1996 conveyance also added language stating it was presumed the Burnetts had an undivided 25% of the mineral rights on the Squaw Bar Placer and an undivided 50% of the mineral rights on the Keller Property.  *Id.*

Thereafter, Amerigold AC conveyed its rights in the Squaw Bar Placer and the Keller Property to A.U. Mines via a quitclaim deed executed and recorded on March 14, 2000.  Ex. Q, Docket No. 157-8.  A.U. Mines and Amerigold LC then executed and recorded a quitclaim of these same interests to Mary Mastagni, Plaintiffs' predecessor in interest, on November 6, 2001. Ex. R, Docket No. 157-7.

To complicate matters, on April 18, 2003, the Duval Trust reconveyed the interests it

REPORT AND RECOMMENDATION - 6

presumably held back to the Burnetts, and a "Return Deed" was recorded thereafter on April 21, 2003, shortly before this lawsuit ensued.  Ex. S, Docket No. 157-8; Aff. of Sorensen, Burnett Depo., Ex. 1 at 6, Docket No. 172-2.   Mr. Brimhall also executed another quitclaim deed on October 24, 2003, which was recorded on October 29, 2003, purporting to grant to the Burnetts "all right title and interest in" the Squaw Bar Placer, including "all interest . . . in and to" the Hollenbeak Lease, as well as "all right title and interest . . . in the mineral rights on the Hubert Sewell Property" (the Keller Property).  Aff. of Burnett, Ex. 02, Docket No. 56.  According to Mr. Burnett, his agreement with Amerigold in 1994 or 1996 was that Mr. Burnett would retain his interest in the Hollenbeak Lease and Amerigold would pay Mr. Brimhall for his interest in the Hollenbeak Lease.  Aff. of Burnett, ¶19, Docket No. 56.  After Amerigold failed to purchase Mr. Brimhall's leasehold interest, Mr. Burnett purchased it and thus the genesis of the 2003 deed.   As of 2003, Mr. Burnett believed he owned at least a 3/8 interest in the mineral rights with respect to the Squaw Bar Placer Claim, 2/8 of a mineral interest in the remainder of the Keller Property, and a 100% interest in the Hollenbeak Lease.  Aff. of Burnett, ¶¶ 20, 21, Docket No. 56.

Plaintiffs in this action derive their interests in the original Sewell Ranch, *see* Ex. A and B, Docket No. 157, from Mr. and Mrs. Mastagni and the Hollenbeak probate estates.  There are multiple conveyances to them from various parties that owned portions of the original Sewell Ranch.  SS Ranch, Inc. conveyed a parcel lying within the Keller Property to AC Ranches, and on March 13, 1993, AC Ranches in turn conveyed a portion of its parcel near Cow Creek to Armando Mastagni, the Keller's predecessor in interest, via a warranty deed recorded on April

12, 1993.  *See* Exs. V, W, Docket Nos. 157-9, 157-10.[6]  The Sewells also conveyed a portion of

the original Sewell ranch near the Jeep Trail and Elfers Creek to Mr. Mastagni via a warranty

deed executed on August 24, 1994, and recorded on September 1, 1994.  Ex. X, Docket No. 157-

9.  SS Ranch, Inc., conveyed the Keller Property described in Ex. B, Docket No. 157, to Rocking

AM Ranch, LLC, via a quitclaim deed executed on September 25, 2006, and recorded on

October 23, 2006.  On September 25, 2006, the Hollenbeak probate estates conveyed via a

personal representative's deed whatever interests the estates may have held in the Keller

Property to the Kellers and Rocking AM Ranch, LLC.  Exs. D, E, C, F, Docket No. 157-1, 157-

2.  Then, through a series of additional conveyances, the Mastagnis conveyed their interests in

the Keller Property to various individual Plaintiffs.  *See* Exs. T, EE, AA, BB, R, Z, Y, Docket

No. 157.

       Plaintiffs on March 20, 2003, filed a complaint seeking an injunction to halt the Burnetts'

mining operation, damages, and to quiet title in the Keller Property.  The Court granted the

Plaintiffs' motion for a preliminary injunction on August 19, 2003, thereby halting further

mining operations on the Keller Property.  Docket No. 32.  The Burnetts and Jared Brown, who

had been associated with Mr. Burnett with respect to the mining operation at Squaw Bar for

fourteen years prior to 2003, filed for bankruptcy under Chapter 7 of the Bankruptcy Code[7] on

---

      [6]  In comparing the deeds, it is apparent to the Court that the legal description of the Keller Property
conveyed in Exs. J and U from the Hollenbeaks and Murrisons to SS Ranch is not identical to the legal description
of the property conveyed in Exs. V and W from SS Ranch to AC Ranches and then to Mr. Mastagni.  But the
property does bear the same general location in "Township 25 North, Range 1 East, Boise Meridian."

      [7]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C.
§§ 101–1330, and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as they
existed prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005
("BAPCPA"), Pub. L. 108-9, 119 Stat. 23 (April 20, 2005), because both of the Debtors' bankruptcy cases were
commenced prior to BAPCPA's effective date of October 17, 2005.  The bankruptcy filings stayed the proceedings
in this case pursuant to 11 U.S.C.§ 362.

REPORT AND RECOMMENDATION - 8

October 14, 2005, in part because of the injunction.  Docket Nos. 32, 98; Aff. of Brown, ¶ 1,

Docket No. 55; *In re Burnett*, Bankr. Case No. 05-22128; *In re Brown*, Bankr. Case No. 05-

22130.[8]

In the Burnetts' bankruptcy schedules, they listed an "interest in mineral rights owned in

Hollenbeak Estate referenced in U.S. Civil Case CV-00113" with an unknown value on Schedule

B as an interest in a partnership or joint venture.  *In re Burnett*, Bankr. Case No. 05-22128,

Docket No. 12.  Mr. Brown also listed the same interest in his Schedule B.  *In re Brown*, Bankr.

Case No. 05-22130, Docket No. 12.  In Schedule G, which covers executory contracts and

unexpired leases, the Burnetts listed an interest in the "mining lease on Squaw Bar Placer -

Patented Mining Claim."  *In re Burnett*, Bankr. Case No. 05-22128, Docket No. 12.

Defendant Global asserts its interest in the Keller Property because it purchased the

Burnetts' mineral interest and Jared Brown's mineral interest in the property from their

bankruptcy trustees.[9]  The Bankruptcy Court issued a notice of public auction under 11 U.S.C. §

363 in each Debtors' bankruptcy case on July 12, 2006, notifying creditors that the mineral

interests, if any, would be sold as assets of the respective bankruptcy estates and that Global had

made an opening bid of $20,000 for both the mineral interests and the mining equipment on the

property.  *In re Burnett*, Bankr. Case No. 05-22128, Docket No. 36; *In re Brown*, Bankr. Case

---

[8]  The Court grants Plaintiffs' motion to take judicial notice (Docket No. 196) under Fed. R. Evid. 201 of its files in the Burnett and Brown bankruptcy cases, and will refer to the docket numbers in those cases.  The Burnetts' bankruptcy schedules are also part of the record in these proceedings.  *See* Aff. of Sorensen, Ex. 4, Docket No. 172.

[9]  Defendant Global is the only defendant to assert an interest in the property as against the Plaintiffs in response to Plaintiffs' motion for partial summary judgment.  The Burnetts did not file a response to Plaintiffs' motion, although they filed an answer asserting an interest in the Keller property.  *See* Docket No. 23.  Defendants Kim and Sara Wilson, Duval Trust, and Frank Duval all filed motions of non-opposition to Plaintiffs' motion for partial summary judgment.  Docket Nos. 161, 166.  Defendants, the Estate of L.K. and Diana Hollenbeak and Mr. Jared Brown, also did not file a response to Plaintiffs' motion.

No. 05-22130, Docket No. 28.  The notice contained a disclaimer that the Chapter 7 Trustee made no warranty of any kind as to the actual existence of any mineral rights Debtors may have owned.  After overruling the Kellers' objection to the Notice of Sale, the sale occurred on August 7, 2006, and the Bankruptcy Court entered an order in each case confirming the sale on September 6, 2006.  *In re Burnett*, Bankr. Case No. 05-22128, Docket No. 43; *In re Brown*, Bankr. Case No. 05-22130, Docket No. 35.

Under the terms of the Bankruptcy Court's Orders, "[a]ny mineral rights that these bankruptcy estates may hold of any kind or nature" were sold to Global free and clear of all liens under 11 U.S.C. § 363.  *In re Burnett*, Bankr. Case No. 05-22128, Docket No. 35.  The Order also stated that it should not be construed as allowing Global the right to enter upon the Keller property without Plaintiffs' permission.  *In re Burnett*, Bankr. Case No. 05-22128, Docket No. 35.  Once the sale was complete, the parties proceeded again in this action to define their respective rights in the Keller Property.

Global asserts that it purchased from the bankruptcy trustee an undivided 25% interest in the mineral rights for the Squaw Bar Placer claim and a 50% interest in the Hollenbeak Lease, and therefore has a right to mine the claim.  Global contends that it derives its interests from the transfer by Burnetts to the Duval Trust before Burnetts conveyed their interest to Amerigold LC. The Duval Trust then reconveyed its interests to Burnetts in April 2003, prior to the bankruptcy filing.  Global also claims that the lease encompasses easement rights to use an access road that Burnett constructed and that is the only access across the Keller Property to the Squaw Bar Placer.  Global seeks to continue mining the Squaw Bar Placer claim over Plaintiffs' objections.

REPORT AND RECOMMENDATION - 10

## II.
## Arguments of the Parties

There are numerous arguments concerning the validity of the Hollenbeak Lease and Global's rights in the mineral interest in the Squaw Bar Placer derived from Burnett.  The Kellers argue that Global purchased nothing by way of the bankruptcy sale, because (1) the Hollenbeak Lease does not satisfy the statute of frauds and is therefore invalid; (2) even if the Hollenbeak Lease is valid and enforceable, Burnett conveyed his interest in the lease to Amerigold LC; (3) Burnett conveyed his entire interest in the Hollenbeak Lease and the mineral rights to the Squaw Bar to Amerigold LC because the Duval Trust did not actually exist, and therefore any conveyance to it or from it was invalid; (4) even if the Duval Trust is a recognized entity capable of holding real property, Burnett's conveyance of the Hollenbeak Lease to the Duval Trust fails because the "assignment" lacks a legal description of the lease rights conveyed; and (5) Amerigold recorded its deeds from Burnett prior to the date the Duval Trust recorded its interests in the same property, thus invalidating the Duval Trust's interest because Amerigold was a bona fide purchaser without knowledge of the Duval Trust's interests.  Alternatively, the Kellers argue that the 1996 conveyance from Burnetts to Amerigold caused the doctrine of after acquired title to prevent Amerigold from claiming bona fide purchaser status, because at that time Amerigold clearly knew of Duval's interests.

Global counters each of the Kellers' arguments with its own, asserting that (1) the Hollenbeak Lease is not invalid and is taken out of the Statute of Fraud because it was performed by Burnett, and the Kellers' predecessors in interest, AC Ranches and SS Ranch, ratified the lease.  Global also asserts the theories of laches and estoppel, claiming that the Mastagnis waited for several years before disputing Mr. Burnett's continued right to mine under the lease; (2) there

REPORT AND RECOMMENDATION - 11

is no evidence that the Duval Trust does not exist, and the parties acted as if it did, thereby creating a disputed issue of fact concerning the invalidity of the transfers between the Duval Trust and Burnetts; (3) the assignment of rights to the Duval Trust contains a sufficient description of the rights conveyed by reference to clearly identifiable extrinsic evidence; (4) Amerigold was not a bona fide purchaser because it received its interests via a quitclaim deed, and had actual knowledge of Duval Trust's interest at the time the first conveyance to it was made; and (5) the rule of after acquired title does not apply.  Finally, Global argues that Mr. and Mrs. Mastagni had actual knowledge of Burnett's mining operations, and are therefore bound by any prior unrecorded interests of which they had knowledge.

Global also asserts an easement in an access road leading from the highway to the Squaw Bar Placer Claim, a road that Burnett constructed to fulfill the terms of the Hollenbeak Lease. Global claims that it has either a prescriptive easement or an easement by implication as part of its lease rights derived from Burnett and the Hollenbeak Lease, because there is no other access to the Squaw Bar Placer.  The Kellers dispute this easement right because the Bankruptcy Court's order confirming the sale of the property from the Burnetts' bankruptcy estate to Global expressly states that Global will need permission from the Kellers to traverse their property to reach the Squaw Bar Placer.  The Kellers also contend that the Burnetts did not list any right to an easement in their bankruptcy schedules, thereby arguing that the Burnetts are estopped from claiming any easement rights that could pass via the bankruptcy sale to Global.  And finally, the Kellers argue that there can be no easement because Mr. Burnett was given permission to build the road from Hollenbeak, and therefore Mr. Burnett can not establish adversity.

In addition, the Kellers have filed two motions to strike statements made by Mr. Burnett

in two separate affidavits.  These statements, if allowed, would permit the Court to consider that

prior to the Burnetts' conveyance to Amerigold, Mr. Burnett verbally informed Amerigold's

principals of the Duval Trusts' interests in the same property.

## II.
### Discussion

**A.      Motions to Strike.**

Keller has filed two separate motions seeking to strike portions of two affidavits of

Lamar Burnett under Fed. R. Civ. P. 12(f) and 56(e) on the grounds that they each contain

inadmissible hearsay and testimony inconsistent with prior sworn deposition testimony.  The

first supplemental affidavit (Docket No. 165) states that Mr. Burnett explained to Amerigold LC

before it purchased from Burnett that Burnett had previously conveyed a 25% interest in the

mineral rights for the Squaw Bar Placer Claim and a 50% interest in the Hollenbeak Lease to

Duval.  Keller contends that this is hearsay and contradicts prior deposition testimony that

Burnett had no knowledge that the deeds to Duval were recorded.  Mem. at 4, Docket No. 170.

*See Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir. 1975) (describing "sham"

affidavits that contradict prior sworn deposition testimony in order to create an issue of fact).

The second supplemental affidavit (Docket No. 174) contains two statements of Burnett that

Keller seeks to strike as inadmissible hearsay, which statements are:

> Prior to execution and delivery of this deed to Amerigold I told
> Noel Tanner about Duval's ownership of 25% of the mineral rights
> on the Squaw Bar Placer claim.
>
> At that time I had told Peter Abt and Noel Tanner both about
> Duval's ownership of the mineral rights pertaining to the Squaw
> Bar Placer claim.

Aff. of Burnett at ¶¶ 6–7, Docket No. 174.

REPORT AND RECOMMENDATION - 13

Defendants Burnett and Global argue that the statements are not hearsay either because they are admissions of a party opponent, or are not hearsay offered for the truth of the matters asserted. Defendants also contend that the statements do not contradict earlier deposition testimony wherein Mr. Burnett explained that the deeds to the Duval Trust were not supposed to be recorded. Aff. of Sorensen, Ex. 1 at 6, Docket No. 172-2.

Fed. R. Civ. P. 56(e)(1) requires affidavits submitted with a motion for summary judgment to be made on personal knowledge and to set forth facts that would be admissible in evidence. Hearsay is inadmissible, and is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A statement is not hearsay if the statement is "offered against a party and is . . . the party's own statement, in either an individual or a representative capacity." Fed. R. Evid. 801(d)(2).

The Court agrees with Defendants that none of the proffered statements are hearsay because they are not offered for the truth of the matters asserted. Rather, the statements purportedly made by Burnett to Amergold's representatives were offered to show knowledge of a prior conveyance, and not for the truth of the matters asserted. Nor do the statements in the first supplemental affidavit directly contradict Burnett's prior deposition testimony. In his deposition, Mr. Burnett explained that the deeds from the Burnetts to the Duval Trust were not supposed to be recorded. He did not state that there was never a conveyance, however. Mr. Burnett's statement to Amerigold that he had previously conveyed interests in the Squaw Bar Placer Claim and the Hollenbeak lease does not conflict with his deposition testimony that he had no knowledge that the deeds effecting those conveyances were recorded. The concepts of

REPORT AND RECOMMENDATION - 14

conveyance and recording are distinct, and therefore Mr. Burnett's statements are not

contradictory.  *See* Idaho Code § 55-601 (explaining that a conveyance of real property is

effected by a writing) and Idaho Code § 55-811 (explaining that a conveyance that has been

recorded provides constructive notice to subsequent purchasers).  The Court will not strike the

statements in the affidavits.

**B.      Summary Judgment Standards**.

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56 provides in

pertinent part that judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A moving party who does not bear the burden of proof at trial may show that no genuine

issue of material fact remains by demonstrating that "there is an absence of evidence to support

the non-moving party's case."  *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).  Once the

moving party meets the requirement of Rule 56 by either showing that no genuine issue of

material fact remains or that there is an absence of evidence to support the non-moving party's

case, the burden shifts to the party resisting the motion who "must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations or denials of

his pleadings."  *Anderson*, 477 U.S. at 256.  Genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."  *Id.* at 250.  "When determining if a genuine factual issue . . . exists, . . . a trial judge must

bear in mind the actual quantum and quality of proof necessary to support liability."  *Id.* at 254.

REPORT AND RECOMMENDATION - 15

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591(9th Cir. 1981).  However, the Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact."  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992).  The Ninth Circuit has found that, to resist a motion for summary judgment,

> the non-moving party:  (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## C.    Plaintiffs' Motion for Partial Summary Judgment.

Whether Global actually purchased any property interests from the Burnetts' bankruptcy estate on September 6, 2006, hinges upon what real property interests the Burnetts had at the time they filed their Chapter 7 Bankruptcy petition on October 14, 2005, and what was sold to

Global under the terms of the Bankruptcy Court's Order.[10]

>    **1.      The Effect of Burnetts' Bankruptcy Filing.**

Under the Bankruptcy Code, the filing of a bankruptcy petition creates a bankruptcy estate comprised of all legal or equitable interests of the debtor in property as of the commencement of the case.  11 U.S.C. § 541(a)(1).  The scope of section 541 is broad and includes <u>all</u> tangible or intangible property of the debtor.  *Cusano v. Klein*, 264 F.3d, 936 (9th Cir. 2001).  Although the debtor is required to list assets in his or her schedules under 11 U.S.C. § 521(1), the failure to schedule an asset does not protect it from the reach of section 541(a)(1).  *See* 11 U.S.C. § 554(d) (property that is not administered remains estate property).  The question of whether an interest claimed by the debtor is property of the estate is a question decided by federal bankruptcy law, while the Court looks to state law to determine the nature and extent of a debtor's interest in specific property.  *In re Martell*, 349 B.R. 233, 235-36 (Bankr. D. Idaho 2005) (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)).

The terms of the Bankruptcy Court's sale order encompassed whatever interest the Burnetts' bankruptcy estate had as of August 7, 2006 in "mineral rights" in the Keller Property. It did not augment property rights that the Burnetts did not possess at the time of filing on October 14, 2005, or that the bankruptcy estate did not possess at the time of the sale.  Thus, whatever mineral interests in the Keller Property and the Squaw Bar Placer that the Burnetts had as of October 14, 2005, and that were not affected by other Code provisions, became Global's

---

[10]   The parties did not address what interests, if any, Jared Brown may have had in the Keller Property and the Squaw Bar Placer by virtue of his "partnership" with Mr. Burnett in the mining operations at Squaw Bar.  *See Kahn v. Central Smelting Co.*, 102 U.S. 641 (1880) (explaining mining partnerships and their differences from ordinary partnerships because a person can convey an interest in the mining partnership without dissolving the partnership).  Absent any such evidence, the Court will focus solely upon the Burnetts' interests.

REPORT AND RECOMMENDATION - 17

property under the terms of the sale order and 11 U.S.C. § 363(b)(1).

Accordingly, the focus of the Court's inquiry is two fold.  First, it must define the property interests the Burnetts possessed as of October 14, 2005, the date their bankruptcy petition was filed, to determine what interests the bankruptcy estate possessed.  To do so, the relevant property transfers and arguments of the parties will be examined.  Second, the Court must assess the effect of the Bankruptcy Code and the terms of the sale order upon the property interests that in turn defined the interests Global purchased.

      **2.**      **The Relevant Property Transfers Defining the Scope of The Burnetts' Rights in the Keller Property.**

Starting from the first transfer of the Keller Property to the Burnetts, there is no dispute that on February 17, 1993, by warranty deed, the Sewells transferred an undivided one-half interest in all mineral rights to the Keller Property to the Burnetts, which property included the Squaw Bar Placer.  Ex. L, Docket No. 157.  Next, there is no dispute that the Hollenbeaks executed a lease on June 15, 1981, purportedly granting to Burnett the right to occupy and mine the Squaw Bar Placer.  Ex. I, Docket No. 157.  And finally, there is no dispute that Plaintiffs derived their interest in the parcel of the Keller Property including the Squaw Bar from Amerigold LC and AU Mines by virtue of the conveyance to Mary Mastagni on November 6, 2001.  *See* Exs. P, Q, R, Docket No. 157.

There are five transfers of the same property that define the parties' dispute.  The first is the Burnetts' March 19, 1993 "Assignment" and Deed of Undivided Interest of 50% of the Hollenbeak Lease and an undivided 25% interest in minerals from the Squaw Bar Placer to the Duval Trust.  These conveyances were recorded on December 29, 1994.  On October 5, 1994, the Burnetts conveyed via quitclaim deed all rights in the Squaw Bar Placer and all rights to

mining claims in the Keller Property to Amerigold LC, which deed was recorded on December 20, 1994, nine days *prior* to the recording of the Burntetts' conveyances to the Duval Trust. Then, on January 30, 1996, Amerigold LC granted the Burnetts back the same interests in a Bargain and Sale Deed, which deed was not recorded until April 21, 2003.  On June 25, 1996, the Burnetts reconveyed the same interests to Amerigold' utilizing different language via a quitclaim deed, which deed was recorded on February 18, 2000.  Then finally, on March 18, 2003, the Duval Trust purportedly returned the interests that the Burnetts had previously granted to it, which deed was recorded on April 21, 2003.

The Burnetts may have held an interest in the Keller Property if the transfers between them and the Duval Trust were enforceable.  If so, then upon the March 2003 reconveyance of those interests from the Duval Trust to the Burnetts, those property interests would have become property of the bankruptcy estate, and Global may have acquired them at the Trustee's sale. Therefore, to determine the property interests the Burnetts possessed at the time of filing for bankruptcy, the Court must examine the validity of the Hollenbeak Lease and the effect of the transfers from the Burnetts to the Duval Trust and back again to the Burnetts.  Once those interests are determined, the Court can then assess the impact of the bankruptcy proceeding upon those property interests, including Global's claim to an easement across the Keller Property.

### 3.       Validity Of The Hollenbeak Lease.

The parties first dispute whether the Hollenbeak Lease is enforceable because it fails to satisfy the Statute of Frauds.  Idaho Code § 9-503 requires leases for a term exceeding one year to be in writing.  Idaho Code § 9-505(4) states that a lease agreement for a term exceeding one year or an interest in property is invalid unless the agreement is in writing and signed by the

party sought to be charged.  To satisfy the writing requirement, all the essentials of the lease must be specified, including a definite and certain term, a legal description of the leased premises, a definite and agreed price of rental, and the manner and time of payment, leaving nothing to be established by extrinsic evidence.  *Hoffman v. SV Co., Inc.*, 628 P.2d 218, 221 (Idaho 1981); *Gaskill v. Jacobs*, 225 P. 499, 500 (Idaho 1924).

If there is a writing, albeit incomplete, which evidences the parties' agreement, the doctrine of part performance may entitle the parties to specific performance, so long as the agreement contains provisions capable of being reduced to certainty.  *Lettunich v. Key Bank Nat'l Assoc.*, 109 P.3d 1104, 1109 (Idaho 2005).  Sufficient part performance removes the contract from the operation of the statute of frauds.  *Hoffman*, 628 P.2d at 222.  To constitute a sufficient part performance, the lessor must be in actual possession, and have made permanent and valuable improvements in reliance upon the agreement.  *Hoffman*, 628 P.2d at 222.

Here, Global has introduced evidence of a disputed issue of fact sufficient to defeat the Kellers' assertion that the Hollenbeak Lease fails to satisfy the statute of frauds.  The lease agreement is incomplete because it does not contain a definite lease term, it does not specify a termination date, it does not address renewal of the lease, and it does not address what happens if the property is sold.  However, Mr. Burnett's affidavit established that he performed according to the lease terms from its execution in 1981, up until the Mastagnis were granted a preliminary injunction preventing further mining activities in 2003.  Mr. Burnett occupied the Squaw Bar Placer, obtained mining permits, paid royalties to the Hollenbeaks, and constructed an access road to the Squaw Bar.  These acts are sufficient part performance, and constitute an issue of fact concerning the enforceability of the Hollenbeak Lease.

Global has also introduced facts to support its theories of estoppel and laches. Generally, silence cannot be relied upon to support estoppel. *Thomas v. Arkoosh Produce, Inc.*, 48 P.3d 1241, 1247 (Idaho 2002). However, "quasi-estoppel may arise when a party who has a duty to speak fails to do so and thereby produces an advantage for himself, or a disadvantage for someone else, which is unconscionable." *Thomas*, 48 P.3d at 1247 (quoting *Lupis v. Peoples Mortgage Co.,*, 690 P.2d 944, 946 (Idaho 2984)). Like quasi-estoppel, laches is an affirmative defense requiring proof that the defendant invaded plaintiff's rights; a delay in asserting plaintiff's rights, the plaintiff having had notice and an opportunity to institute suit; lack of knowledge by the defendant that plaintiff would assert his rights; and injury or prejudice to the defendant in the event relief is accorded to plaintiff or the suit is not held to be barred. *Thomas*, 48 P.3d at 1248.

Global's evidence in opposition to the Keller's motion established that Mr. and Mrs. Mastagni acquired rights in the Keller Property in 1993 (*see* Aff. of Keller, Ex. W), and that Mr. Burnett's mining operation on the Squaw Bar Placer was open, notorious, and clearly visible from Highway 55 at that time. *See* affidavits, Docket Nos. 62 –75. Mr. Burnett's affidavit also established that Mr. and Mrs. Mastagni may have been provided with a copy of the Hollenbeak Lease at the time they purchased the Keller Property in 1993. Aff. of Burnett at 8-9, ¶¶ 21-22, Docket No. 56. Yet, the Mastagnis apparently failed to invoke any rights they may have had in the Hollenbeak Lease until this lawsuit was filed on March 20, 2003. Ten years elapsed before the Mastagnis decided to enforce any rights to the property Mr. Burnett occupied. Accordingly, there is an issue of fact concerning Global's equitable theories of and estoppel and laches that may permit enforcement of the lease.

4.        **The Duval Transfers.**

The next issue concerns the validity of the transfers from the Burnetts to the Duval Trust. The Kellers argue that the two transfers to the Duval Trust, which included a 50% interest in the Hollenbeak Lease and a 25% interest in minerals from the Squaw Bar Placer, were invalid because the Duval Trust did not actually exist and therefore could not hold property interests.  In the alternative, the Kellers argue that the "assignment" of the Hollenbeak Lease to the Duval Trust was invalid because it lacked a legal description.  And finally, the Kellers argue that Amerigold was a bona fide purchaser that recorded its deeds without prior knowledge of the Duval Trust's unrecorded interests.  Global counters each argument, introducing disputed issues of fact precluding summary judgment.

It is generally true that a deed made out to a fictitious person is void.  *Oregon v. Bureau of Land Management*, 876 F.2d 1419, 1425 (9th Cir. 1989) (citing *Moffat v. United States*, 112 U.S. 24, 31-32 (1884)).  But, in *Hill v. Hill*, 102 P.3d 1131 (Idaho 2004), the Idaho Supreme Court denied summary judgment in a case involving a disputed trust.  In that case, there was an unsigned trust document, yet a deed granted property to the trust.  The court found that there was an issue of disputed material fact, because the deed was evidence of an intent to create a trust.  *Hill*, 102 P.3d at 1133.  Because the deed constituted sufficient evidence of the parties' intent to create a trust despite lack of a signed trust document, there was a material issue of fact precluding summary judgment.

The Keller's attempt at the hearing to distinguish *Hill* from the facts in this case is unavailing.  First, the Duval Defendants do not unequivocally deny the trust's existence.  Rather, Mr. Duval simply states he was "unable to state with certainty whether said Trust was ever

REPORT AND RECOMMENDATION - 22

created." Aff. of Sorensen, Ex. 2 at 6, Docket No. 172-3.  While the deed conveying the mineral interests and the interest in the Hollenbeak Lease does not name a trustee, it grants the interests to the "Duval Family 1988 Reversionary Trust."  And, most importantly, Duval and the Burnetts acted as if there had been a conveyance.  Duval, on behalf of the Duval Trust, accepted the interests, and the Burnetts acted as if the transfers were valid.  Upon the reconveyance back to the Burnetts from the Duval Trust in 2003, Mr. Burnett paid Mr. Duval consideration for the return deeds.  Aff. of Sorensen, Ex. 1 at 6, Docket No. 172-2.  Even if there was no trust, the parties did not address the possibility that a conveyance to Mr. Duval, in his individual capacity, could have been intended absent the existence of the trust under the facts in this case.

Accordingly, liberally construing all facts and drawing all reasonable inferences from the facts in favor of Global, genuine issues of material fact exist concerning whether or not the Duval Family Trust came into existence, Frank Duval's position as trustee, and the validity of the conveyance to either the trust or Frank Duval individually.  Therefore, the Assignment by Burnetts to the Duval Defendants of the 50% interest in the Hollenbeak Lease and the deed of an undivided 25% interest in minerals from the Squaw Bar Mining Claim could be valid and enforceable.  Because there are genuine issues of material fact regarding the existence of the trust, the Kellers are not entitled to summary judgment as a matter of law.

As for the "Assignment" of the Hollenbeak Lease, it is true that a written instrument purporting to convey an interest in real property must contain a sufficient description of the property.  *City of Kellogg v. Mission Mountain Interests Ltd., Co.*, 16 P.3d 915, 920 (Idaho 2000).  "A description contained in a deed will be sufficient so long as quantity, identity or boundaries of property can be determined from the face of the instrument, or by reference to

extrinsic evidence to which it refers." *City of Kellogg*, 16 P.3d at 920.  Presuming the

Hollenbeak Lease was enforceable and therefore capable in the first place of being conveyed,

there is no disputed issue of material fact concerning the description in the Assignment from

Burnetts to the Duval Trust plainly referring to the Hollenbeak Lease, which contains a sufficient

legal description of the Squaw Bar Placer claim.

     5.     **The Transfers to Amerigold LC.**

     The next disputed issue is whether Amerigold LC received the entirety of the Burnetts'

interest in the Squaw Bar and the Hollenbeak Lease because it was a bona fide purchaser without

knowledge of the Duval Trusts prior interests.  As previously discussed, the initial assignment of

the Hollenbeak Lease and the transfer of the Squaw Bar minerals from the Burnetts to the Duval

Trust occurred on March 19, 1993, but the conveyances were not recorded until December 29,

1994.  Yet the Burnetts conveyed "all rights" in the Squaw Bar to Amerigold LC on October 5,

1994, via  a quitclaim deed recorded on October 20, 1994.  Then, for reasons not clear in the

record, Amerigold LC granted a "bargain and sale deed" to the Burnetts of these same interests

on January 30, 1996, and the Burnetts on June 25, 1996, reconveyed the interests again to

Amerigold LC via a quitclaim deed recorded on February 18, 2000.  The parties argue over

whether Amerigold LC was a bona fide purchaser, and whether it purchased the property

interests with knowledge of the Duval Trust's prior unrecorded interest.  Alternatively, Global

asserts the doctrine of after acquired title caused the property presumably conveyed to the Duval

Trust in 1993 to vest upon the reconveyance back from Amerigold LC to the Burnetts in 1996.

     The principles underlying conveyances of real property are well established.  Under

Idaho Code § 55-812, "every conveyance of real property . . . is void as against any subsequent

purchaser . . . of the same property" if the purchaser in good faith and for a valuable consideration was first to record. *See also* Idaho Code § 55-606.[11]  A quitclaim deed conveys whatever interest the grantors possess at the time of the conveyance. *Luce v. Marble*, 127 P.3d 167, 173 (Idaho 2005).[12]  But, if a subsequent purchaser of property has actual or constructive knowledge of a prior unrecorded interest, then that purchaser can not defeat the prior unrecorded interest. *Bear Island Water Ass'n, Inc. v. Brown*, 874 P.2d 528, 536 (Idaho 1994); *Farm Bureau Finance Co., Inc. v. Carney*, 605 P.2d 509, 511 (Idaho 1980).  And, if a person purports by a proper instrument to convey or grant real property in fee simple, and thereafter acquires title to that property, the after-acquired property passes by operation of law to the grantee or his successors.  Idaho Code § 55-605.

        With these principles in mind, there are disputed issues of fact concerning the transfers between the Burnetts and Amerigold on the one hand, and to the Duval Trust on the other.  Mr. Burnett in his affidavits established that at the time of the 1994 conveyance to Amerigold, he mentioned to Amerigold's principals that he had previously conveyed a portion of these same interests to the Duval Trust.  Suppl. Affs. of Burnett, Docket Nos. 165, 174.  Therefore, there is a disputed issue of fact concerning Amerigold's bona fide purchaser status, because Amerigold may have known of the prior unrecorded interests of the Duval Trust.  If so, then Amerigold

_____

[11]  That section states, "[e]very grant or conveyance of an estate in real property is conclusive against the grantor, also against every one subsequently claiming under him, except a purchaser or encumbrancer, who in good faith, and for a valuable consideration, acquires a title or lien by an instrument or valid judgment lien that is first duly recorded."

[12]  In its Memorandum, (Mem. at 5, Docket No. 163), Global incorrectly cites *Leland v. Isenbeck*, 1 Idaho 469 (Idaho Terr. 1873) for the proposition that a grantee receiving property by quitclaim deed cannot be a bona fide purchaser without notice.  Rather, *Leland* held that a quitclaim deed conveyed no better title than that which was vested in the grantors at the time of the conveyance, and if the grantors held defective title to the property, the grantees in turn received defective title.

shared its ownership of the Hollenbeak Lease and the "mining claims" in the Keller Property, which included the Squaw Bar, with the Duval Trust as a result of the October 1994 conveyance from the Burnetts to Amerigold.

Even if the Court disregards the statements made by Mr. Burnett to Amerigold[13] and considers Amerigold to be a bona fide purchaser upon the initial 1994 transfer, the doctrine of after acquired title and the two subsequent conveyances between the Burnetts and Amerigold are enough to defeat the Kellers' argument that Amerigold possessed bona fide purchaser status and held all of the Burnetts' interests. First, the Kellers conveniently failed to mention in their initial brief that on January 30, 1996, Amerigold conveyed back to the Burnetts all of the interests it had previously received from the Burnetts in 1994. Aff. of Burnett, Ex. N, Docket No. 56-15. In January 1996, the Burnetts again possessed title to the Keller Property, including the rights they held in the minerals of the Squaw Bar Placer and the Hollenbeak Lease. Previously, in 1993, the Burnetts had given deeds to the Duval Trust, which may have been void because the Duval Trust did not record them before the Burnetts' conveyance to Amerigold in 1994. If the deeds to the Duval Trust were effective as a conveyance, those deeds would have conveyed the after-acquired legal title that the Burnetts received from Amerigold in January 1996. Idaho Code§ 55-605; *Moore v. Scroggie*, 704 P.2d 364, 370 (Idaho Ct. App. 1985).

Finally, there is a third reason that Amerigold did not receive title to the Keller Property as a bona fide purchaser, and this is because of the June 25, 1996 conveyance. There can be no dispute concerning the language of the Quitclaim Deed reconveying the Burnetts' interests in the Squaw Bar and Keller Property to Amerigold on June 25, 1996. The Quitclaim Deed expressly

---

[13] In this instance, even if the Court were to exclude Mr. Burnett's statements as hearsay, their exclusion would be immaterial.

REPORT AND RECOMMENDATION - 26

stated that the Burnetts were "presumed" to own 25% of the rights in the Squaw Bar Placer, and "presumed" to have 50% of the mineral rights in the Keller Property. Even had Mr. Burnett verbally said nothing to Amerigold, the language on the face of the second quitclaim deed would have put Amerigold on notice that Burnett was not conveying all of his rights in the property such that Amerigold could not claim to be a bona fide purchaser. Moreover, the Duval Trust had finally recorded its interests on December 29, 1994, prior to the 1996 reconveyance from the Burnetts to Amerigold. Then, on April 18, 2003, prior to the bankruptcy filing, the Duval Trust "returned" the interests it presumably held to the Burnetts.[14]

The facts above are the crucial facts that preclude summary judgment in this case. As discussed earlier in this opinion, genuine issues of  material fact exist concerning whether or not the Duval Family Trust came into existence or whether absent the trust, Frank Duval was meant to hold the interests individually. Therefore, the initial assignment from the Burnetts to the Duval Trust of the 50% interest in the Hollenbeak Lease and the deed of the undivided 25% interest in minerals from the Squaw Bar Mining Claim could be an enforceable transfer. If the transfer to the Duval Trust is enforceable and those interests remained with the Duval Trust until the Duvals returned them in 2003 to the Burnetts, it is conceivable that the Burnetts possessed a 50% interest in the Hollenbeak Lease and an undivided 25% interest in minerals from the Squaw Bar Mining Claim that became bankruptcy estate property upon the filing of their petition on October 14, 2005. These facts preclude entry of summary judgment as a matter of law, but *only* with respect to the 25% mineral interest Global claims in the Squaw Bar Placer claim, as will be

---

[14]  None of the parties discussed whether or not the alleged invalidity of the transfers to the Duval Trust in 1993 meant that the Burnetts continued to possess all rights in the property that may have been intended to be partially conveyed in the 1996 deeds to Amerigold due to the language that the Burnetts were "presumed" to hold only a portion of the interests conveyed.

discussed below.

  **6.**  **Bankruptcy Issues Affecting the Hollenbeak Lease.**

  Although the parties may believe the existence of the above disputed issues of fact end the analysis concerning the Hollenbeak Lease, they are mistaken.  Both parties availed themselves of the opportunity to submit supplemental briefing requested by the Court concerning the Bankruptcy Code's effect upon the Hollenbeak Lease.  *See* Docket Nos. 195, 197.  The Court agrees with the Kellers' analysis, which renders the disputed factual issues concerning the lease immaterial.  If the disputed issues above are decided in the Kellers' favor, the Kellers are entitled to summary judgment quieting title with regard to the Hollenbeak Lease.  But if the disputed issues of fact are decided in favor of Global, thereby rendering the Hollenbeak Lease enforceable and property of the bankruptcy estate under 11 U.S.C. § 541(a), 11 U.S.C. § 365(d)(4) of the Bankruptcy Code has implications in this case that *also* require summary judgment quieting title to the Hollenbeak Lease in the Plaintiffs.

  Global's argument that it purchased the Burnetts' rights in the Hollenbeak Lease from the Chapter 7 Trustee is unavailing under the Bankruptcy Code.  The Burnetts disclosed their interest in the Hollenbeak Lease on Schedule G as an executory, unexpired lease.  11 U.S.C. § 365(d)(4) provides that, in a case under any chapter of Title 11, if the trustee "does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, . . . then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor."  11 U.S.C. § 365(d)(4).  The voluntary filing of a bankruptcy petition "'constitutes an order for relief' for purposes of section 365(d)(4)."  *In re Elm Inn, Inc.* (*Anderson v. Elm Inn, Inc.*), 942

F.2d 630, 633 (9th Cir. 1991) (citing 11 U.S.C. § 301).  When a lease is deemed rejected under Section 365(d)(4), the lease is no longer property of the bankruptcy estate.  *Elm Inn, Inc.*, 942 F.3d at 634 (citing *In re Damianopoulos*, 93 B.R. 3, 6 (Bankr. N.D.N.Y. 1988) and explaining that the majority view holds that a lease deemed rejected is no longer estate property).[15]

The Court has not been provided with any evidence or argument suggesting that the Hollenbeak Lease does not satisfy the prerequisites for application of Section 365(4)(d).  If the Hollenbeak Lease was enforceable, executory, and capable of further performance, the Trustee's failure to assume the lease within the 60 day period meant it was deemed rejected by operation of law, the debtors' possessory interest in the lease terminated, and the lessors had a right to immediate surrender of the premises as well as a claim for lease rejection damages.  11 U.S.C. §§ 365(g), 502(g); *Elm Inn, Inc.*, 942 F.2d at 633–34; *In re Ashby*, 00.2 I.B.C.R. 92, 93 (Bankr. D. Idaho 2000).  The relevant 60 day period commenced on October 14, 2005, and expired well before the Trustee's sale occurred on August 7, 2006.  By operation of the Bankruptcy Code, therefore, Global could not have purchased any interest in the Hollenbeak Lease at the time of the sale because the Trustee had not assumed it, and therefore could not sell it.  According to Sandra Keller's supplemental affidavit, it is undisputed that Sandra Keller is the current lessor, and the Kellers are therefore entitled to summary judgment quieting title in the Hollenbeak Lease.  Second Aff. of Keller, ¶ 2, Docket No. 195-1.

---

[15]  Global is correct that the Bankruptcy Code treats the rejection of a lease as a breach, giving rise to a claim under 11 U.S.C. § 365(g) by the lessor.  3 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 365.09[3] at 365-83 (15th ed. rev. 2008) (explaining that rejection constitutes a breach under 11 U.S.C. § 365(g)).  But, absent the filing of a proof of claim for lease rejection damages under 11 U.S.C. § 502(g), the lessor is not entitled to any other remedy and, contrary to Global's argument, there can be no further sale of the lease by the Trustee to any third party once a lease or executory contract is deemed rejected under 11 U.S.C. § 365.  Only creditors and third parties have rights under the rejected lease for claims arising from its breach.  *See* COLLIER ON BANKRUPTCY ¶ 365.09[3] at 365-84 (explaining that rejection of a lease does not damage rights of third parties in the leasehold, but that it does extinguish the debtor's right to possession).

REPORT AND RECOMMENDATION - 29

Alternatively, if the disputed issues of fact are decided in favor of the Kellers, 11 U.S.C. § 365(c)(3) also prevented the Trustee from assuming and selling the lease.  Under Section 365(d)(4), in order to assume or reject a lease, it must be "executory" or "unexpired."  If a lease is terminated prepetition under applicable nonbankruptcy law, then under 11 U.S.C. § 365(c)(3), the bankruptcy trustee may not assume or assign a lease.[16]  The Hollenbeak Lease could be unenforceable due to the statute of frauds, or it could have been terminated because of the injunction the Court entered on August 19, 2003, preventing Burnett from mining upon the Keller property.  If so, there was nothing for the Trustee to assume at the time of the bankruptcy filing.  11 U.S.C. § 365(c)(3) only permits a trustee to assume a lease of nonresidential real property if it has not been terminated under applicable nonbankruptcy law prior to the order for relief.  *See Vanderpark Properties, Inc. v. Buchbinder* (*In re Windmill Farms, Inc.*), 841 F.2d 1467, 1469 (9th Cir. 1988); 3 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 365.02[2] at 365-23 (15th ed. rev. 2008) (explaining that there is nothing for the trustee to assume if a lease has been terminated prepetition).  Again, under this scenario, Global could not have purchased any interest in the Hollenbeak Lease at the time of the Trustee's sale on August 7, 2006, because the Trustee could not have assumed it and therefore could not sell or assign it.

Because of the Bankruptcy Code's implications, it does not matter how the disputed state law issues are decided concerning the Hollenbeak Lease.  Therefore, the disputed issues of fact are immaterial.  Taking all of the evidence in a light most favorable to Global, the nonmoving party, and assuming the Hollenbeak Lease was valid and enforceable at the time of filing, 11

---

[16]  11 U.S.C. § 365(c)(3) states that "[t]he trustee may not assume or assign any executory contract or unexpired lease of the debtor, . . . if . . . such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief[.]"

U.S.C. § 365(d)(4) rendered the lease rejected.  If the lease was terminated or unenforceable prepetition, 11 U.S.C. § 365(c)(3) prevented the Trustee from assuming the lease and selling it.[17] Therefore Global could not have, by operation of law, purchased any interest in the Hollenbeak Lease.  Summary judgment quieting title in the Kellers with respect to the Hollenbeak Lease is warranted.

### 7.  Validity of the Easement and Sale in Bankruptcy.

Global also asserts an easement in an access road leading from the highway to the Squaw Bar Placer Claim, a road that Mr. Burnett constructed to fulfill the terms of the Hollenbeak Lease.  Global claims that it has a prescriptive easement or an easement by implication, either derivative of any lease rights from the Hollenbeak Lease, or under a theory of adverse use.  The Kellers dispute this easement right because the Bankruptcy Court's order confirming the sale of the property from the Burnetts' bankruptcy estate to Global expressly states that Global will need permission from the Kellers to traverse their property to reach the Squaw Bar Placer, and alternatively, Mr. Burnett used the road with permission from the Hollenbeaks.

Again, even if all of the disputed issues of fact are decided in Global's favor, none of them are material.  To address Global's first argument that the easement was an implied right of the Hollenbeak Lease, because the lease either could not be or was not assumed under 11 U.S.C. § 365, Global could not have purchased the Hollenbeak Lease from the Chapter 7 Trustee at the sale.  Consequently, by operation of law, Global did not purchase any implied easement rights derivative of the lease.

---

[17]  Because of the implications of 11 U.S.C. § 365, the Court has not addressed the Kellers' argument that the terms of the sale order excluded any leasehold rights, although that may provide alternative grounds to grant summary judgment to the Kellers with respect to the Hollenbeak Lease.  The Bankruptcy Court's sale order explicitly limited the sale to "mineral rights."

Turning to Global's other argument, that an easement arose either by necessity or as a prescriptive easement and became bankruptcy estate property on October 14, 2005, there are three reasons why Global did not purchase any easement rights.  First, the transfers between the Burnetts and the Duval Trust did not mention transfer of an easement.  Global's rights, if any, are derivative of the 2003 transfer from the Duval Trust back to the Burnetts.  But, the transfers between the Burnetts and the Duval Trust consisted of an undivided 50% interest in the Hollenbeak Lease and an undivided 25% interest in minerals of the Squaw Bar Placer.  According to the face of the deeds, no easement rights were identified in the transfers that ultimately would have become property of the Burnetts' bankruptcy estate.

Second, Idaho law provides a specific mechanism for claiming an easement that was not followed.[18]  Idaho Code § 47-901 states the owner or occupant of a mining claim may have and acquire a right of way for ingress and egress over and across the lands or mining claims of others.  Idaho Code § 47-903 provides a mechanism for the mine owner to claim a right of way, either by agreement or through court proceedings in state district court if the landowner does not agree.  This Court's prior order deciding the Kellers' motion for preliminary injunction, issued on August 19, 2003, discussed the implications of Idaho Code § 47-901.  The Court stated, "[i]t is clear in this case that the Plaintiffs, as the alleged surface owners, have not given such permission nor have the Defendants secured a right of way pursuant to I.C. §§ 47-901, 902 (Docket No. 18). . . . Thus, there does not appear to be an existing right of way."  Mem. Decision at 4, Docket No. 32.  The parties omitted any discussion of Idaho Code § 47-901 in their briefing here on Plaintiffs' Motion for Partial Summary Judgment and presented no evidence concerning

---

[18]  The parties did not address this section, nor did they argue whether or not a prescriptive easement can arise if Idaho Code § 47-901 was not followed.

REPORT AND RECOMMENDATION - 32

any permission the Kellers or their predecessors may have granted.  All evidence was to the contrary, and therefore summary judgment should be granted to the Kellers.

Lastly, even if all disputed facts were decided in Global's favor and Burnett possessed an implied easement created by prior use or a prescriptive easement, the Bankruptcy Court's sale order did not purport to sell an easement.  An easement is a property right that exists separate and apart from any mineral rights that the Burnetts disclosed in their schedules.  *See* Idaho Code § 47-901 (providing for a grant of right-of-way for mining purposes, which is a separate right apart from the right to mine); *see also Davis v. Peacock*, 991 P.2d 362, 366 (Idaho 1999) (explaining that an easement implied by prior use may be created by open and continuous use of the easement with knowledge by subsequent purchasers of the dominant estate).  As such, it is a property right that would have become bankruptcy estate property under 11 U.S.C. § 541(a), whether or not the Burnetts disclosed the interest in their bankruptcy schedules.  *Cusano v. Klein*, 264 F.3d, 936 (9th Cir. 2001).[19]  The Bankruptcy Court's sale order explicitly stated only "mineral rights," not any other property rights, were sold to Global by the Chapter 7 Trustee. "Mineral rights" do not encompass an easement right.  *See, e.g.*, Idaho Code § 47-701 (defining "mineral rights" as "all coal, oil, oil shale, gas, phosphate, sodium, asbestos, gold, silver, lead, zinc, copper, antimony, geothermal resources, salable mineral, and all other . . . minerals of whatsoever kind or character.").  And, the sale order stated that Global could not enter upon the

---

[19]  The Keller's estoppel argument concerning the Burnetts' failure to disclose the asset in their schedules is misplaced.  They argued that the Burnetts are estopped from claiming any easement rights that could pass via the bankruptcy sale to Global.  However, upon filing for bankruptcy, the Burnetts no longer "owned" the easement, but rather under 11 U.S.C. § 541(a) the easement became bankruptcy estate property, and the Chapter 7 Trustee had the right to sell it under 11 U.S.C. § 363(b)(1) if it had value to the bankruptcy estate.  "A debtor's concealment of an asset does not estop a bankruptcy Trustee from recovering the asset" and pursuing the claim or asset once discovered.  *In re Riley*, 2007 WL 2332424 at *3 (Bankr. E.D. Wash. 2007).  *See also In re Davis*, 2002 WL 33939739 at *5 (Bankr. D. Idaho 2002) (explaining that the debtor's failure to schedule property simply means that the asset continues to belong to the bankruptcy estate, and the debtor is estopped from claiming it for himself).

REPORT AND RECOMMENDATION - 33

Keller Property without permission from the Kellers.  Therefore, under the terms of the Bankruptcy Court's sale order, Global did not purchase any easement rights, and summary judgment is properly granted to the Kellers concerning the easement claimed by Global.[20]

---

[20] Assuming the easement did become part of the Burnetts' bankruptcy estate, the fact that the easement was not disclosed on the Burnetts' schedules implicates 11 U.S.C. § 554(d).  That section states, "[u]nless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."  By not scheduling the asset and not including it in the sale, the asset may not have been administered.  It therefore would have remained "property of the estate–forever."  *Diamond Z Trailer, Inc. v. JZ L.L.C.* (*In re JZ, L.L.C.*), 371 B.R. 412, 418 (9th Cir. BAP 2007).  This opinion does not resolve any issue that may exist between the Kellers and the Burnetts' Chapter 7 Bankruptcy Trustee, who would be entitled to assert any rights in the easement, if the easement existed.

REPORT AND RECOMMENDATION - 34

## <u>RECOMMENDATION</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY RECOMMENDED that:**

1)      Plaintiffs' Motion for Partial Summary Judgment (Docket No. 155) should be **GRANTED IN PART** and **DENIED IN PART** in accordance with this memorandum.

2)      Defendant Global's Motion to Strike Aff. of Burnett (Docket No. 170) shall be **DENIED**.

3)      Defendant Global's Motion to Strike Second Aff. of Burnett (Docket No. 176) shall be **DENIED**.

4)      Plaintiffs' Motion to Take Judicial Notice (Docket No. 196) shall be **GRANTED**.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.



DATED: July 21, 2008

Honorable Candy W. Dale
United States Magistrate Judge

REPORT AND RECOMMENDATION - 35